First case on our call today is agenda number three, number 131279, People of the State of Illinois v. Grayson. Counsel, are you prepared to proceed? Good morning, Your Honors. May it please the Court, Counsel, I'm Assistant Attorney General Michael Cibula on behalf of the people of the State of Illinois. Defendant is a former Sangamon County Sheriff's Deputy who is currently charged with murder and awaiting trial because he fatally shot an unarmed woman in her home. Although this case is in a pretrial setting, the facts are already well established. The shooting was captured on another deputy's body-worn camera. And based on that footage, as well as the police report, defendant wrote an independent expert or an expert report in which he concluded that defendant unnecessarily escalated the situation with an unarmed woman and shot her without justification. In this appeal, defendant, as Your Honors know, is challenging the Supreme Court's judgment, denying him pretrial release. But I wanted to note at the start that the issue before this Court is even a little more narrow than that because he does not challenge several parts of the Supreme Court's judgment. Specifically, he doesn't challenge the finding that the evidence or presumption is great that he committed a detainable offense, meaning the first-degree murder of Ms. Massey. Importantly, he also doesn't challenge the finding that he currently poses a real and present threat to the public. The only thing at issue is his challenge to the Supreme Court's finding that no conditions of release would mitigate the threat he undisputedly poses. Circuit Court got this exactly right. The evidence does show that conditions of release would not be enough. Under the law… Counsel, let me ask you a question. You say the evidence shows. Specifically, tell us what evidence we should be looking at. I know in this instance there was a motion that was filed after the initial detention decision. And my understanding is that both parties offered additional evidence that wasn't offered at the time the Circuit Court made the initial decision. So should we be looking at that evidence? What are we looking at here? So I think one point that I think maybe the defendant made in her brief is that at that second hearing, which I was referring to, there was the prosecutor pointed out that when a risk assessment had been conducted, they had not taken into account that he had a prior criminal history. And I believe technically the defendant would have an argument that maybe that should have been considered. But the defendant admits in her brief, in his brief, that they waived that argument. So the evidence before this court is, I think, all the evidence that the Circuit Court had before it in both hearings, which is the body-worn camera footage, most importantly, as well as the expert report and the undisputed facts of his… What about defendant's medical records? Weren't those attached to the motion, the second motion? That was attached to the motion. We have not challenged that, frankly, because I think the nature of his medical condition is not a major issue in this case. It's not subject to dispute. We want the court to consider all the facts before the Circuit Court. So to be clear, we're not saying don't ignore this or ignore that. We might say it's not entitled to be weighed, but we're not asking this court to ignore specific evidence. Anything that was before the Circuit Court, we're saying it's fair game at this point in the litigation. What the law does direct us to do is, as I said, look at the specific facts and circumstances of the offense, as well as his background, criminal history, things of that nature. In terms of his specific facts and circumstances of this offense, as the Circuit Court said, this offense shows that the defendant has a dangerous impulsiveness, a terrible lack of judgment, that we cannot rely on conditions of release to mitigate. What the body-worn camera footage shows is that on the night of the shooting, the defendant and his partner responded to reports of a prowler outside Ms. Massey's home. The defendant knocked on his door, had a brief conversation with Ms. Massey, and she said, Ms. Massey was very polite to them, appreciative. She literally said, love y'all, thank y'all, and started to reenter her home. Less than four minutes after she said, love y'all, thank y'all, the defendant fakely shot her. Now, what happened in those four minutes is that the defendant stopped Ms. Massey from entering her home, began asking her about a call that was parked in her driveway. He then followed her inside her home into her living room. Once they were in her living room, the defendant told Ms. Massey to provide him with identification. The key point is that Ms. Massey was completely compliant. She wasn't combative or rude or certainly unaggressive. She sat on her couch, began looking through her purse for her ID. The defendant then looked across the room from the living room to the kitchen, sees something cooking on the stove, tells her to go turn it off. Again, Ms. Massey was completely compliant, polite. She did what she was told, went into the kitchen, turned off the stove, carried the pot to the sink, turned on the faucet. At that point in time, Ms. Massey disagreed, had not done or said anything aggressively. She's still in the kitchen, the defendant's in the living room, and she says to him, you know, what are you doing? And he says, well, I'm getting away from that hot steaming water, to which she responded sort of tiredly, oh, I rebuke you in the name of Jesus. Now, obviously, as the expert report said, rebuking someone in the name of Jesus is not a physical threat, certainly nothing that any reasonable person would say prompts or justifies a lethal response from anyone. And that's especially true in this case because Ms. Massey was a very small woman, obviously unarmed. She's in a separate room from the defendant with meaningful distance between them, as well as a kitchen counter between them. So she's obviously no threat. But what did the defendant do? As the footage shows, as the expert report shows, he unnecessarily escalated the situation. If you'll excuse my language for a moment, he said to her, you better fucking not. I swear to God, I will fucking shoot you right in your fucking face. Then he pulled out his gun and pointed it at her. Ms. Massey still didn't respond in an aggressive way. She basically said, I'm sorry, out of her hands, ducked below the kitchen counter. So, again, obviously no threat. Nevertheless, the defendant advanced towards her, fatally shot her. As the expert report pointed out, that's completely unjustified. He escalated the situation. And as the circuit court correctly noted, that shows a dangerous impulsiveness, complete lack of judgment. We can't rely on conditions of release to mitigate that. Now, in a moment, I expect counsel will stand up here and say, well, Ms. Massey threw a pot of boiling water at the defendant. There's a couple problems with that. There's a procedural problem. And more importantly, there's a couple of substantive problems with that. The procedural problem is that despite the fact there were multiple hearings in the circuit court, obviously a couple of proceedings, the defendant didn't raise that argument below, so it's forfeited. More importantly, though, it's a meritless argument, which is probably why it was not raised before. To counsel's credit, the defendant admits in his brief that nothing in the video actually shows Ms. Massey throwing a pot of boiling water at the defendant. The defendant just asked this court to assume that she did because there is some steam you see on the ground and there's a very small amount of water on the floor you see after the shooting. But the more reasonable assumption is that she didn't throw a pot of boiling water at him. She either knocked it over or dropped it because he screamed at her, dropped the leaping pot, and then shot her. That's why we see water on the floor, but we don't see a pot flying through the air. Let me answer this question. This is not a trial. Correct. We're not here to determine the facts of these charges. We're not here to determine state of mind, any kind of defenses that can be raised. Certainly, we're in this interesting, maybe that's a weak word, but this place where the evidence is this video that anyone can see. But I think the question that Justice Holder White is raising is, what evidence should we be looking at for the issue that is before us, whether there are any conditions to mitigate risk? The statute specifically says, and this Court has talked about syndicalitis, that when you're considering this specific question of this third element, are conditions of release sufficient? You look at the specific nature and circumstances of the offense, which I've been describing, and you also look at the weight of the evidence. So all of that goes to what I've been discussing, exactly what he did, whether there's any justification or explanation. And the way it specifically relates, as the circuit court tied it together, is when you look at the specific facts and circumstances of the shooting, this is someone who acts impulsively. This is someone who has terrible judgment. And if they cannot comply with basic expectations of society, which is to not escalate situations to this degree, then we cannot expect them to comply with conditions of release. Counsel, we know, based on a recent decision from this Court, that our standard of review is de novo. That case had not come out at the time that the appellate court rendered its decision in this case. We all know the term de novo. We know no deference. But what should de novo review look like in this instance? I think what this Court needs to do is to watch the video itself, read the expert report itself, look at all the evidence, and make an independent judgment based on that, whether conditions of release would be sufficient. So it starts from zero, as if there had not been any prior decisions on this specific issue. The other aspect of the shooting, I think it's important to note, as it relates to would conditions of release be enough. And Slippy pointed this out, and there's also appellate precedent for this point, is that this shooting occurred right next to another law enforcement officer. And the defendant says in his brief, well, correctly or incorrectly, I was acting on the spur of the moment. This language he uses, or reasonably or unreasonably, I was acting in the heat of the moment, and I was not deterred by the presence of this law enforcement officer right next to me. And that's important because in a few moments, I expect counsel is going to come up here and say that home monitoring is enough. Home monitoring will protect the public. As we pointed out briefly, public courts recognize in other cases there's limits and problems with home monitoring. It only keeps track of the defendant's GPS location. It doesn't really stop them from breaking conditions of release or harming someone else. Also, it's important to remember, home monitoring is not a 24 hours a day, 7 days a week lockdown. If the defendant were released to home confinement, he would be statutorily entitled to leave his house at least 2 days a week for basic life activities. In a lot of cases, those limitations or problems would not be an issue. But they are an issue in this case due to the nature of the offense, which is a fatal, violent offense. But also, as the circuit court pointed out, this was an offense that occurred right next to a law enforcement officer. And the defendant says, I wasn't deterred by that. I didn't think about it. I was acting in the spur of the moment. Well, if you act in the spur of the moment, and you're not deterred by a law enforcement officer literally standing next to you, you can't come to court and say you will be deterred by a system that just keeps track of your GPS location. The last aspect of the shooting I just want to briefly mention. Counsel, also with respect to another law enforcement officer being present, I believe that the defendant argued the other officer also drew his weapon. What are we, if anything, to draw from that? Sure, Your Honor. I think there's two important points that you have to keep in mind when you think of that. It is absolutely true the other officer pulled out his gun. The sequence is defendant pulls out his gun first, threatens to shoot her in her face. Then his partner pulls out his gun. I think it's fairly obvious his partner is automatically pulling out his gun to back up his partner, as he's presumably trained to do. He was obviously not making an independent judgment, I believe, that she was a threat. And the most important point is what happened after they both had their guns pulled out. Defendant advanced towards Ms. Massey and shot her in the head fatally. The other defendant didn't. Defendant was not arrested or charged with anything because he pointed a gun at Ms. Massey. He was arrested and harassed in front of the detainee because he shot Ms. Massey, which the other officer didn't do. Just quickly in terms of what happened after the shooting, I don't think there's much to speak about this. Defendant did contact dispatch to tell them they needed EMS. But after that, he did nothing to help Ms. Massey. I apologize for being graphic, but after the shooting, she was laying on her kitchen floor, gasping for breath. Defendant didn't do anything to help, didn't show any sympathy or empathy for her. The other deputy who was to credit did what he could, grabbing kitchen towels, trying to stop her bleeding. Meanwhile, defendant was outside, inside, outside, saying, I won't repeat it. Court knows what he said, calloused things about Ms. Massey. And as the court pointed out, the cert court pointed out, this shows that someone who doesn't have a product of humanity are the people, and it also shows that someone who doesn't comply with basic expectations of society, which is to help someone when they're distressed. If he doesn't comply with those basic expectations of society, he's not going to comply with the conditions of the police. Moving away from the shooting just quickly, the other relevant factor the statute directs us to look at is his personal background, circumstances, situation, and history. Defendant has pointed out that he's engaged, he owns a house, he was diagnosed with cancer a few years ago. None of that really matters or is entitled to any weight because all of those factors existed before he killed Ms. Massey. They obviously didn't prevent him from killing Ms. Massey, so you can't argue that they mitigated the risk in the future. The only thing that's really relevant about his background is that he does have at least some criminal history. It's undisputed. He has a couple of driving offenses for driving while intoxicated. It's undisputed that he violated laws regarding body-worn cameras. He didn't turn it on when he was supposed to. It's been clear that this case doesn't change on his criminal history. It's something that the statute directs us to consider, but these facts do show about his criminal history that he's someone who in the past hasn't complied with the law, hasn't complied with what he's supposed to do, which is another reason not to support the Supreme Court's decision that we can't rely on him to comply with conditions of the police. Unless there are any other questions, we would ask this court to reverse the Appellate Court's judgment and affirm the Supreme Court's judgment. Thank you. Thank you very much, Counselor. Counsel for the appellee. Good morning, Your Honors Counsel. My name is Deborah Pugh, and I represent the appellee, Sean Grayson. This case presents a very small, very contained issue, and the question is, did the state prove by clear and convincing evidence that Sean Grayson would not comply with conditions should he be released prior to trial? The Fourth District Court found unanimously that the state failed to make that showing, and this court should affirm the Fourth District's finding and remand his case for hearing on conditions of release. Now, at this point, Sean Grayson is presumed innocent, and more importantly for this case, he, like every other defendant, is presumed eligible for pretrial release. The burden is on the state to prove that he should not be released and that he would not comply with conditions. As the Fourth District said, the issue before the court is not the defendant's guilt or innocence, but whether he should be detained prior to trial. Now, the state wanted to focus primarily on the circumstances of the offense, but I want to start with the personal characteristics of the defendant, which is equally important to the circumstances of the offense. And first, Mr. Grayson has no violent history whatsoever. This is a 30-year-old man who has no history of violence on the job, off the job, at any time. There is no evidence whatsoever that he's ever engaged in anything like this previously. On the Virginia pretrial assessment, which determines whether or not the defendant should be released prior to trial is one of the factors to be considered, he scored low enough that the recommendation was that he be released with whatever special conditions were recommended by the trial court. And counsel, did that include his criminal history, that assessment? It didn't. The first time when it was first talked about, it didn't include it. But the entire Virginia assessment was included as an exhibit in the motion for relief. And it shows that of the factors that exist in the Virginia assessment, he actually would have had a zero had it not been for the prior DUIs. The DUIs brought it up to a two. And so that would put him at level one. And level one, even with such a violent charge, the suggestion, the recommendation is release with whatever special conditions are recommended. So at some point it was stated that he had a three on the Virginia assessment. But actually looking at what the qualifications are for any of the points, it's not clear where that number came from because it really appears that he could only be a two at most based on the prior DUIs. And it is relevant that he's a member of the community and he owns a house with his fiancee that he served in the military. And these are all things that show that he's a member of the community, somebody who's not looking to violate any conditions of the police. And crucially, he's cooperated with the investigation and the prosecution of this case from the beginning. He cooperated completely with the Illinois State Police report. He stayed home after the incident prior to the indictment. Within 30 minutes of the indictment being issued, he turned himself in. These are not the actions of somebody who will not comply with conditions. Mr. Grayson wants to stay in court, and he does not want to jeopardize his credibility or anything related to what will happen at trial based on violating the conditions of release. That's showing a certain amount of lawlessness that would only harm him at trial. And so he has every incentive not to. And the incident here, while obviously tragic, it happened during a unique high-stress situation that won't happen again. As the Fourth District unanimously found, this case arises purely out of defendant's law enforcement role, but that circumstance no longer exists now that he's discharged. Speaking specifically to that, isn't it some of the findings of the State Police's investigation that despite being trained to respond in a manner that would not escalate a situation like this, despite that training, yet this happened? And also not having his camera on? Any other things that he would have been trained to do as a police officer? One of the things in the ISP report indicates that it is unknown if the Sagamon County Sheriff's Office had mandated the de-escalation training for their deputies. And so there's not evidence about it. This is one of the things that the appellate court found, is that there was not evidence about what his training was, but presumably there would be some expectation of trying to de-escalate. I will acknowledge that. And as for the body cam, what he did, he didn't have the body cam on, but he was expected, the circuit court found that he knew that his, or should have known that his partner's body cam was on, so he knew that everything he was doing was being recorded. So that, in your opinion, alleviates his responsibility? Oh, no, not at all. What I want to stress, though, is that the second the shooting occurred, he turned it on, and knowing that there's the 30-second pre-event recording that happens, so that he actually, his actually... But doesn't it go to his willingness to follow rules? I think that one thing about that is, because we don't actually, I don't know why he didn't have it on the entire time. I don't know that there's not evidence about why he didn't. But I also want to stress is that the state could have charged him with that, but that having the body cam not on is a criminal offense, but it's not detainable. And so the legislature doesn't believe that not having the body cam on shows that somebody wouldn't comply with conditions of release. In fact, you're not even permitted to be detained if that's the only charge against you. And so while that is a factor that could be considered, there's not a lot of information about why he did, and because he did, he did turn it on, allowing us to see the entirety of the shooting and the few seconds before the shooting, it shows that he wasn't trying to hide anything. So maybe he didn't have it on, but he's not, contrary to what the state is trying to suggest, this is a person who is acting the way he thought he should be acting. And I want to stress something in the ISP report, which is that, so after Ms. Macy put the pot down, and then she ducked below the counter, and so he couldn't see her anymore, and so it makes sense that he would be moving toward her so that he could see what she was doing, because as he said, he didn't know what she was doing back there. He advanced on her, and the ISP report found, quote, because of Deputy Grayson's advancement, Deputy Grayson had no other option but to fire his duty weapon at that point, and it also found that both deputies were justified in pointing their service weapons at Ms. Macy. So you're saying because of Deputy Grayson's advancement, so because of his actions, it escalated the situation to where he felt the need to fire his weapon. The report ultimately found that the shooting wasn't justified because of his advancement, but it did find that once he had advanced, in order to see what was actually happening behind the counter, where he didn't know whether she had a weapon, which is one of the things he said in the ISP report, then that was at the moment that the report found that he had no other option, but yes, it was as a result of him advancing toward her. But I also want to stress that the video— Counsel, I also asked your opponent about what de novo review looks like, and I want to ask you the same question. What should we be doing, and what evidence should we be considering? Do we start at the beginning when he responded to her call? Where do we start, and what do we consider, and what does de novo look like? I think that this court can look at absolutely everything that was before the trial court. Because there was no live testimony in order to weigh credibility, this court can see everything that the trial judge considered and can consider it de novo. And so that starts with the other deputies' body cam footage, and it goes through all of the evidence, including the health issues that were brought up and the prior DUIs that were brought up at the motion. So this court can consider everything. But I also want to stress that when the 4th District reversed the circuit court, it was reversing it, considering it using the standard of abuse of discretion. So even not using the standard of de novo review, the 4th District found that the circuit court had considered the evidence incorrectly. The nature of the analysis done by the 4th District appellate court, I realize that they indicated it was an abuse of discretion standard, but the analysis they did, did that look like abuse of discretion, or did it seem more like de novo? I have not considered that, whether or not which, but I understand the point you're making in terms of looking at the ways in which the court considered the evidence. I'm trying to think, I mean, in terms of looking at whether there was evidence of his training. There wasn't evidence of the training, and so in order to be focusing on that, I don't know, that's a difficult question to consider, but it's also not essential to be considered, because this court can look de novo at both the 4th District and the circuit court. And the 4th District did find that because this was such an anomalous situation, that because, and he'd never, Mr. Grayson had never engaged in any behavior like this previously. It was this anomalous situation. Now, the state says that this was dangerously impulsive, but impulsive acts, police officers have to act on a second-by-second basis all the time. Those actions are not impulsive. Of course, they are spur-of-the-moment, because you don't know what's going to be happening. He was in somebody's house late at night, didn't know what the circumstance was going to be. The statement, I rebuke you in the name of Jesus, might not have been a threat, but I think it was also a peculiar thing to be saying at that moment, that he found a strange thing to be saying, and so that sort of was part of the circumstances as well. And I also want to focus this court's attention on the throwing of the pot. Now, the state says that there's no evidence that the pot was thrown, but there is evidence that the pot was thrown. When this court slows down the video taken from Mr. Grayson's body cam, you can see Ms. Massey standing up, grabbing the pot, and you can see her arms going up. And then the next thing you see is the pot several feet in front of her on the chair right next to Mr. Grayson. Now, this is not at all to suggest that there's equality between throwing a pot of boiling water and shooting, but it does talk to the circumstances of the offense. And it also says that this water was thrown, and it's a relevant factor. The shooting happened at the same moment the water was thrown, and so that was a spur-of-the-moment situation where he was trying to figure out how to respond in the moment. But again, I also want to stress that his mindset is a matter for trial, and so we don't have to consider, or in fact we shouldn't consider the mens rea aspects of it at this moment, because all we're trying to do, except for to the degree the mens rea has any effect on his compliance with any conditions of release. Now, and also in terms of him being a dangerously impulsive person, if he were so impulsive he would be doing this kind of thing other than just this one specific moment in his career as a police officer when he's 30 years old. This would be a different situation if this happened off-duty or in a situation that would ever recur, but this will not recur. And as far as the conditions of release go, the state tries to suggest that they're not effective, but in fact the conditions that are available are extremely strict and they're extremely effective. The state and... May I ask you that? What conditions do you think would be appropriate in this case? I think in this case the conditions that were asked for below were home monitoring and were home confinement and electronic monitoring. And anything else? Any other? Oh, and all of the other. I mean, there are a lot of mandatory conditions, and then the court can also have enormous discretion in order to impose any conditions that they wish. So, for instance, his house can be searched at any point. He had already surrendered all of his weapons by the time he turned himself in, but his house can be searched. The court can also say any time you leave the house, even if it's to go to the oncologist or something like that, you have to pre-clear it with your pre-trial supervisor. And in fact, it would be wise to do that because, as it shows on this court's website, the report from the Office of Pre-trial Services shows that when a defendant is at home, his location is transmitted every 60 seconds. When the defendant is not at home, it gets transmitted every 30 seconds. And so if the defendant is leaving his house, the pre-trial services would find that out within 30 seconds. So, yes, of course, that doesn't prevent physically somebody from violating the conditions of their release, but it does indicate that they would be discovered essentially immediately. And also, crucially, the statute doesn't require prevention. The court requires mitigating. And so would being on home confinement mitigate any risk of his release? Yes, absolutely. Would being on electronic monitoring ping his location every 30 seconds if he's not at home? Yes, absolutely. Having his house searched, having to indicate any time he leaves the house, and only having to get pre-approval. And also I want to stress that… Counsel, but that would require the defendant's cooperation in terms of wearing or utilizing any equipment that would transmit that information, right? That's correct. But violating that is its own criminal offense. It's a criminal offense of escape. And that would mean that he would be, like, being charged with a new offense while you're on pre-trial release means that your pre-trial release is revoked. It would be a revocation hearing. And if you're charged with a misdemeanor or felony offense while you're on pre-trial release… Could I go back to what does de novo look like? I mean, you say here the most appropriate condition would be electronic monitoring and home confinement, and you indicate that we require, as Justice Holder-White just said too, we require his cooperation to achieve that. There certainly has been an argument made that the fact that he had an obligation to wear, turn on, and activate his body camera indicates that he did not follow the rules in that situation. So now an argument is made if he's released on electronic monitoring, that's an indication that that would not mitigate his dangerousness. Now, that's an argument to be made. I mean, it's not a frivolous argument to be made. So what does de novo look like? Are we just choosing one rationale over the other, substituting one judgment for the other, weighing them in some way? What does de novo look like? De novo review in this case looks like precisely what the circuit court is tasked with doing, which is looking at all of the evidence, and the statute doesn't indicate in what way the evidence should be weighed in terms of what the different factors that can be considered are, the defendant's personal characteristics, the circumstances of the offense, whether he's likely to obstruct justice. It doesn't indicate how those can be weighed. The court, even though it's de novo review, when it's de novo review, this court has the discretion to figure out how it wants to be weighing these elements, because you're looking at the evidence precisely as the circuit court did. Counsel, using the facts of this case, how would you describe the difference between de novo review and one court substituting its judgment for that of the lower court? What's the difference under these facts, and what happened here? I think in this case, it's not substituting. This court would not be substituting, and the Fourth District did not substitute. It's judgment for the lower court. It's looking at the evidence fresh, and also looking at the errors that the lower court made in terms of not. . . Highlight some of those errors for me. One of them being that the court found that electronic monitoring isn't effective. One thing about that is that, as far as I can tell, there hasn't been any evidence presented to any of the courts. The courts that are finding how ineffective electronic monitoring is, there hasn't been any kind of expert witness. What we have is what was on this court's website, but it actually is very effective. That's one. How about some others? The court was also concerned about whether or not . . . It was looking more about whether it could prevent any violating of conditions rather than mitigating, and the issue is mitigating. If it weren't just mitigating, then there wouldn't be any pretrial release for anybody if you were required to prevent it. The court also placed a lot of weight on things like the body camera, but I want to say as a sort of counterweight to the body camera film not being on, and not only did he turn it on so that it did capture the key moments of the incident, but also when he had his DUIs. The one thing that we can say is that when he had his DUIs, which were when he was a younger man, like 20, 21 years old, 9 and 10 years ago, there was no evidence that he didn't follow all of the conditions of his release. He was under supervision for one and convicted for the other. And as this court knows . . . How long was that supervision? I don't know how long the supervision was. It was pretty brief, wasn't it? I think in general for a DUI, for Class A DUIs, it tends to be very strict conditions for a shorter period of time, but with the supervision that he did comply with the . . . There was no indication that he didn't comply with any of these things, and this is even as a younger man where he's likely to have been more impulsive than he is now. And so the only thing that can really be pointed to as far as him not complying with requirements is the body cam. But again, he knew that he was being reported by the . . . Well, isn't the fact that he got two DUIs? You know, he complied with supervision, but he didn't comply with the don't drink and drive. Yes, that part does not look great. But I also want to stress that he was a much younger man then. I mean, he was 20, 21 years old. In the intervening years, there have been no convictions. There was no evidence of any arrests. This was all the state had against him in terms of . . . Counsel, could the trial court properly look at, number one, if the defendant couldn't conform his conduct to the requirements of the supervision in the earlier DUI and later his conduct as a sworn police officer, how could . . . is it reasonable for the trial court to then conclude that perhaps as a private citizen, under these conditions of release, he wouldn't be able to conform his conduct to the conditions of supervision? And would that be a reasonable conclusion for the court to come to? And if not, why not? I think looking at all of the circumstances as a whole, it would not be a reasonable conclusion because of what's actually happening in this case right now. This is a man who's facing extremely serious charges, who knows that if he violates the conditions of his release, he will almost certainly be caught. And that would harm his case before his trial in terms of trying to present evidence of his mens rea at the time of this incident, which is a crucial issue. And so if he's showing a degree of lawlessness in terms of not complying with the conditions, that would only affect him negatively. And there's no . . . this is one instance where there's been that kind of violent activity happening. There have been, of course, with the body cam where he didn't do what he was supposed to be doing, but now his incentives are so much greater than they were at that time. He has every reason to comply with the conditions of release, and the state really has not presented any evidence to show that this person would not look at the situation he's in now and decide, yes, I'm going to comply with the conditions of release, I'm going to stay home, and I'm going to work with my attorneys to prepare for my case, and so that he can have the benefit of not being in prison, or being in jail. And, in fact, he's in jail in a different county. And so he would be able to be home working on his defense and also contributing to his household and all of those things that . . . Also, would you bring your remarks to a close? Yes, I will. So, for all of these reasons, I would ask that this court affirm the Fourth District's opinion and remand for a hearing on conditions of release. Thank you. Thank you, Counsel. And, Counsel, in reply. A few quick comments, if I may, Your Honors. The defendant made a few arguments that are forfeited or actually contrary to what the defendant previously argued. I'd like to point those out and the other arguments that are contrary to the facts. I was surprised to hear Counsel kind of begin by focusing on the risk assessment and even more surprised to hear her argue that this court should consider that he scored a zero or a one. To be very clear, in the circuit court, the defendant's own counsel said he scored a three. So, that's different than what you just found arguing. The prosecution said, well, I think you're forgetting a few points that were bumped it up. The bottom line is we don't actually know what the score is. And the defendant's brief in this court did not discuss the risk assessment tool at all, certainly did not rely on it as a reason to grant for trial release, certainly didn't argue that he scored a zero or a one. So, Counsel can't bring that argument up for the first time in oral argument. In terms of the throwing of the pot, again, the defense counsel just stood up here and said that the video shows Ms. Massey throwing the pot. If you look at page 16 of the defense brief in this court, the defendant admits that the video does not show Ms. Massey throwing the pot. She asks the court to make an assumption based on the fact that there was water on the floor. But let's assume for the sake of argument that Ms. Massey did throw a pot boiling water at the defendant. I don't think the evidence shows that. Let's assume that her new argument is correct. Defendant is really asking this court to ignore everything that led up to her allegedly throwing the pot. What happened? At that point in time, he had already pulled out his gun. He had already pointed his gun at her. He had already threatened to shoot her in the face. He had already advanced towards her and he had already begun firing. So, even if we assume for the sake of argument that she allegedly threw the pot when he said she did, he had already escalated the situation beyond all reason. Ms. Massey did not do anything wrong. Defendant was the one who instigated this. Defendant is the one who escalated the situation. The last point, Your Honor, is kind of an argument I think is kind of a troubling argument and it points to the problem with the defendant. Defendant has tried to argue that this is a high-stress situation. It's a very unique situation that only a police officer would encounter. I think we all know and hopefully agree being a police officer is a difficult job. They are sometimes put in very difficult positions, very high-stress positions, where they have to make life-and-death decisions that link the line. This is absolutely not that case. Ms. Massey was compliant every step of the way. Ms. Massey was polite every step of the way. Ms. Massey was appreciative. She said, love you all, thank you all. This was not a high-stress situation, and the fact that defendant viewed it as a high-stress situation should be deeply troubling because it shows exactly what the circuit court said. He has terrible judgment. He impulsively resorts to violence. For these reasons and the reasons I've discussed and discussed in our brief, the circuit court got this exactly right. He should be detained pending trial. If there are any other questions, we ask the court to reverse the appellate court's judgment and affirm the circuit court's judgment. Thank you. Thank you very much. This case, Agenda Number 3, Number 131279, People of the State of Illinois v. Grayson, will be taken under advisement. Thank you both for your argument.